1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

8
9
10

COVE ASSOCIATES JOINT VENTURE
D/B/A/ LIFE CARE CENTER OF
SCOTTSDALE,

11

No.  1:10-cv-01316 (BJR)
No.  1:10-cv-01356 (BJR)

12

*Plaintiff*

ORDER AND MEMORANDUM OF
LAW ON MOTIONS FOR SUMMARY
JUDGMENT

13

v.

14
15

KATHLEEN SEBELIUS, Secretary United States
Department of Health and Human Services.

16
17

*Defendant.*

18
19

SELECT SPECIALITY HOSPITAL-DENVER,
INC., et. al.,

20
21

*Plaintiffs*

22

v.

23

KATHLEEN SEBELIUS, Secretary United States
Department of Health and Human Services.

24
25

*Defendant.*

ORDER-1

## I.    INTRODUCTION

This matter is before the court on the parties' motions and cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. The motions were filed in *Select Specialty Hospital-Denver, Inc. v. Sebelius*, 1:10-cv-01356 (BJR) and *Cove Associates Joint Venture d/b/a/ Life Care Center of Scottsdale v. Sebelius*, 1:10-cv-01316 (BJR). The cases involve substantially similar factual allegations and procedural history, and implicate identical statutes, regulations and interpretive guidance. Accordingly, the court will address all of the outstanding motions in this order.

The cases comprise challenges to two final decisions of Defendant Kathleen Sebelius, the Secretary of Health and Human Services ("Defendant" or the "Secretary"), in which she denied Medicare reimbursement for certain "bad debts" Select Specialty Hospital-Denver, Inc. ("Select Specialty") and Cove Associates Joint Venture d/b/a/ Life Care Center of Scottsdale ("Scottsdale") (collectively referred to as "Plaintiffs" or the facilities) incurred as a result of treating patients eligible for both Medicare and Medicaid (known as dual-eligible beneficiaries or "dual-eligibles"). The Secretary denied reimbursement to Plaintiffs on the grounds that the facilities failed to comply with the agency's "must-bill" policy—a policy that requires a provider to bill its state's Medicaid program for costs associated with dual-eligibles before claiming payment for such costs as Medicare bad debt.

Plaintiffs move this court for relief from the Secretary's final decisions, alleging that they are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Defendant opposes the motions and moves with its own motions, requesting that the court uphold the Secretary's decisions. Having reviewed the brief and having entertained oral argument, the court finds as follows.

ORDER-2

## II.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Medicare Program

The Medicare program, established by Title XVIII of the Social Security Act, commonly known as the Medicare statute, pays for covered medical care provided primarily to eligible aged and disabled persons. *See* 42 U.S.C. § 1395, *et seq*. The Centers for Medicare & Medicaid Services ("CMS") is the operating component of the Department of Health and Human Services ("HHS") charged with administering the Medicare program. The program consists of four main parts; Part A, at issue here, provides coverage for the costs of hospital services, related post-hospital services, home health, and hospice care. *See* 42 U.S.C. §§ 1395c - 1395i-5. This includes skilled nursing services. *See* 42 U.S.C. § 1395f(a)(2)(B).

Skilled nursing facilities ("SNF") and Long Term Care Hospitals ("LTCH") may participate in the Medicare program as a "provider" of services by entering into a "provider agreement" with the Secretary. 42 U.S.C. §§ 1395cc, 1395x(u). During the period at issue here, CMS contracted with private insurance companies to act as "fiscal intermediaries" ("FIs") and assist in the day-to-day operations of the Medicare program. *See* 42 U.S.C. § 1395h (2004). The FI determines the payment to be made to a provider based on audits of annual cost reports submitted by the provider. 42 C.F.R. § 413.20. To receive payment from Medicare for services rendered, the provider is required to file a Medicare cost report with its FI at the end of a cost reporting year. 42 C.F.R. § 413.20. The FI is responsible for reviewing the cost report and issuing a Notice of Program Reimbursement ("NPR") which sets forth the amount of allowable Medicare payments. 42 C.F.R. § 405.1803.

A provider that is dissatisfied with a NPR decision may appeal to the Provider Reimbursement Review Board ("PRRB" or the "Board"), an administrative tribunal within HHS

established to hear Medicare reimbursement disputes. 42 U.S.C. § 1395oo(a). A decision of the PRRB is final unless the Secretary, on her own motion, reverses, affirms or modifies the Board's decision. *See* 42 U.S.C. § 1395oo(f).

The Secretary has delegated her authority to review PRRB decisions to the Administrator of CMS. 2 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(a)(1). A provider dissatisfied with a decision of the PRRB or the Secretary, if the Secretary reviews the Board's decision, may seek judicial review of that decision by filing a civil action within 60 days of the date that notice of the final decision is received. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(b).

**B.     The Medicaid Program**

Title XIX of the Social Security Act, commonly known as the Medicaid statute, establishes a cooperative federal-state program that finances medical care for the poor, regardless of age. *See* 42 U.S.C. §§ 1396-1396v. To participate in Medicaid, a state must submit a plan to the Secretary that sets forth, among other things, financial eligibility criteria, covered medical services, and reimbursement methods and standards. 42 U.S.C. §§ 1396a(a), 1396a(b), 1396b. If the Secretary approves the state's Medicaid plan, the state's payments are considered to be expenditures made "under" the state plan. 42 U.S.C. § 1396b(a)(1). Expenditures made under the state plan, in turn, are matched by federal funds according to a percentage formula tied to the per-capita income in the state, with the percentage ranging from fifty percent to eighty-three percent of the cost of medical services provided under the plan. 42 U.S.C. §§ 1396b; 1396d(b). "Although participation in the Medicaid program is entirely optional, once a state elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae*, 448 U.S. 297, 301 (1980).

Unique problems are presented by the existence of persons who qualify for both

ORDER-4

Medicare and Medicaid (so-called "dual eligibles"), a group composed chiefly of elderly poor individuals. In many cases, they cannot afford Medicare Part A deductibles and coinsurances. For this reason, Medicaid allows states to use Medicaid dollars to pay the cost-sharing obligations of dual-eligible individuals. *See* 42 U.S.C. § 1396a(a)(10)(E)(i). Because the federal government heavily subsidizes Medicaid, this enables states to shift a large portion, though not all, of the cost of caring for the elderly poor to the federal treasury. Plaintiffs "[do] not admit residents whose primary pay source is Medicaid," but they do admit dual-eligible beneficiaries. (*Cove Associates Joint Venture d/b/a/ Life Care Center of Scottsdale v. Sebelius*, 1:10-cv-01316 (BJR) Administrative Record ("C-AR"), C-Dkt. No. 10 at 186, 277; *Specialty Hospital-Denver, Inc. v. Sebelius*, 1:10-cv-01356 (BJR) Administrative Record ("S-AR"), S-Dkt. No. 15 at 639.).

### C.      Medicare "Bad Debts"

Prior to July 1, 1998, the Medicare program paid SNFs and LTCHs for furnishing care to Medicare beneficiaries based on a retrospective determination of the facilities' "reasonable cost" as defined in the Secretary's regulations and identified in a provider's annual cost report. *See* 42 U.S.C. §§ 1395f(b), 1395x(v)(1)(A); 42 C.F.R. § 413.1 *et seq*. Beginning on July 1, 1998, Congress established a prospective payment system under which facilities are reimbursed through prospectively-fixed rates. *See* 42 U.S.C. § 1395yy(e); 42 C.F.R. § 413.300 *et seq*. However, certain other Medicare payments continued to be retrospectively determined and reimbursed on a reasonable cost basis, including the unpaid deductible and coinsurance obligations of Medicare beneficiaries – or "bad debts" – at issue here. 42 C.F.R. § 413.89(a), (h).

The Secretary has issued regulations regarding the financial documentation that providers

must maintain for reimbursement purposes. 42 C.F.R. §§ 413.20, 413.24. The regulations require providers to "maintain sufficient financial records and statistical data for proper determination of costs payable under the program." 42 C.F.R. § 413.20(a). The Secretary's regulations also define "bad debts" as:

> amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

42 C.F.R. § 413.89(b)(1); *see* Provider Reimbursement Manual ("PRM") § 302.1 (ex. 1 at 3-3).

Unpaid patient obligations in general are treated as reductions in revenue rather than reimbursable "costs" of furnishing care. 42 C.F.R. § 413.89(a), (c). However, because the Medicare statute provides that the Secretary's regulations may not result in the costs of Medicare-covered services being shifted to non-Medicare patients (or their payers), *see* 42 U.S.C. § 1395x(v)(1)(A)(i), the regulations provide for reimbursement of Medicare bad debts so that the costs of Medicare services covered by such amounts are not borne by other patients. 42 C.F.R. § 413.89(d). This policy is known as the prohibition against cost-shifting or cross-subsidization.

Medicare is the primary insurer for dual-eligibles and covers medically necessary services. Medicaid acts as the secondary payer. To prevent windfalls for providers that might otherwise have strong incentives to simply "write off" unpaid Medicare obligations as bad debts rather than pursue collection of the amounts, the Secretary's regulations establish several criteria that an unpaid Medicare obligation must meet to be allowed as a "bad debt." The criteria are:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
> (2) The provider must be able to establish that reasonable collection efforts were made.
> (3) The debt was actually uncollectible when claimed as worthless.

ORDER-6

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e); PRM § 308 attached to Dkt. No. 14 as Ex. 1 at 3-5.

The PRM, issued together with similar guidelines and letters under the Secretary's interpretive rulemaking authority, explain and clarify the application of the reimbursement regulations. *See Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995). PRM § 310 instructs that a provider's effort to collect Medicare deductible and coinsurance amounts will only be considered "reasonable" if the effort is "similar to the effort the provider puts forth to collect" comparable non-Medicare debts. (Dkt. No. 14, Ex. 1 at 3-5.). PRM § 310 describes the types of collection action with respect "to the party responsible for the patient's personal financial obligations" that must be taken to satisfy the "reasonable collection efforts" requirement. (*Id.*). One such requirement is that the collection efforts "must involve the issuance of a bill." (*Id.*).

With respect to a patient's personal financial obligations, whenever a provider is able to establish that a patient is indigent, a presumption of uncollectibility applies, and the provider may claim the related debt without first pursuing the collection efforts described in PRM § 310. (*See* PRM § 312 attached to Dkt. No. 14 as Ex. 1, 3-6 to 3-7.). While PRM § 312 sets forth guidelines for determining a patient's indigence, it also contains a categorical rule that "[p]roviders can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy or medically needy individuals, respectively." *Id.* However, these provisions do not speak to the financial obligations of the state Medicaid program under these circumstances.

Another provision of the PRM does speak to states' obligations in this regard. Section 322 of the PRM provides guidance on reimbursement for bad debts that arise due to nonpayment

ORDER-7

of Medicare co-payments and deductible amounts owed to providers relating to services provided to dual-eligibles. PRM § 322 provides that any portion of deductible or coinsurance amounts that a state is not obligated to pay under its Medicaid program can be claimed as a Medicare bad debt, provided that the requirements of PRM § 312, or, if applicable, PRM § 310 are met. (*See* PRM § 322 attached to Dkt. No. 14 as Ex.1, 3-8 to 3-9.). However, where "a State is obligated by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, these amounts are not allowable as bad debts under Medicare." *Id.*

On August 10, 2004, CMS issued Joint Signature Memorandum 370 ("JSM-370"), which provides:

> In order to fulfill the requirement that a provider make a "reasonable" collection effort with respect to the deductibles and co-insurance amounts owed by dual-eligible patients, our bad debt policy requires the provider to bill the patient or entity legally responsible for the patient's [. . .] medical bill; *e.g.*, title XIX, local welfare agency . . . . prior to claiming the bad debt from Medicare.

> \*        \*        \*

> [I]n those instances where the state owes none or only a portion of the dual-eligible patient's deductible or co-pay, the unpaid liability for the bad debt is not reimbursable to the provider by Medicare until the provider bills the State, and the State refuses payment (with a State Remittance advice).

(C-AR at 552 (quotation omitted).). A "remittance advice" is the particular device used by state Medicaid programs to notify providers of the state's Medicaid liability for costs. JSM-370 also referenced a recent Ninth Circuit decision, *Cmty. Hosp. of the Monterey Peninsula v. Thompson*, 323 F.3d 782, 799 (9th Cir. 2003):

> In November of 1995, language was added in PRM-II Section 1102.3L (the cost report questionnaire) that allowed providers to show other documentation in lieu of billing the states. Unfortunately, that language conflicted with the billing requirements in Chapter 3 of the PRM-I, and the Ninth Circuit panel found Section 1102.3L to be inconsistent with the Secretary's must-bill policy. The

panel also noted that, effective in August of 1987, Congress had imposed a moratorium on changes in bad-debt-reimbursement policies, and therefore the Secretary lacked authority in November of 1995 to effect a change in policy. As a result of the Ninth Circuit decision, we changed the language in PRM-II Section 1102.3l to revert back to pre-1995 language, which requires providers to bill the individual states for dual-eligibles' co-pays and deductibles before claiming Medicare bad debt.

*Id*. at 552-53 (internal citations omitted).

The *Cmty. Hosp. of the Monterey Peninsula* decision and the JSM reference the so-called bad debt "moratorium" enacted by Congress in 1987. The bad debt moratorium required as follows:

In making payments to hospitals under [the Medicare program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including the criteria for what constitutes a reasonable collection effort . . . and for determining whether to refer a claim to an external collection agency). The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for . . . determining whether to refer a claim to an external collection agency, has accepted such policy before that date.

*Omnibus Budget Reconciliation Act of 1987*, Pub. L. No. 100-203, sec. 4008(c), 101 Stat. 1330-55, as amended by the Technical Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, sec. 8402, 102 Stat. 3798, and as further amended by the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, sec. 6023, 103 Stat. 2176 (codified as a note to 42 U.S.C. § 1395f (1992)).

## III.   STATEMENT OF MATERIAL FACTS ON THE ADMINISTRATIVE RECORDS

Scottsdale operates Life Care Center of Scottsdale, a freestanding skilled nursing facility located in Scottsdale, Arizona. (C-AR at 116-17.). The Scottsdale facility participates in Medicare and provides covered health care services to Medicare beneficiaries. (*Id*. at 219, 516.).

Select Specialty operates long term care hospitals in Wilmington, Delaware; Jefferson Parish, Louisiana; Fort Smith, Arkansas; Denver, Colorado; and Orlando, Florida. (S-AR at 674.). These facilities also participate in Medicare and provide covered health care services to Medicare beneficiaries. (*Id*. at 674.). Therefore, Plaintiffs' patients include Medicare beneficiaries who are obligated to pay coinsurance.

During the relevant time period, none of the facilities participated in their respective state's Medicaid programs. (C-AR at 158; S-AR at 640.). As such, Plaintiffs did not admit residents who were only Medicaid eligible. However, the facilities did provide health services to Medicare beneficiaries who may have also been eligible for their states' Medicaid programs, in other words, dual-eligibles. (C-AR at 120; S-AR at 639.).

In fiscal years 2004 and 2005, Plaintiffs incurred bad debts related to Medicare-covered services—specifically related to the Medicare cost-sharing amounts owed in connection with such services.[1] (C-AR at 158; S-AR at 639.). Stated otherwise, Plaintiffs were not paid for some Medicare deductible and coinsurance amounts owed by dual-eligibles. *Id*.

Scottsdale's fiscal intermediary, Riverbend Government Benefits Administrator ("Riverbend" or "FI"), finalized adjustments to Scottsdale's 2004 cost report in an Notice of Program Reimbursement ("NPR") dated June 2, 2006. It denied $46,694 of the facility's total Medicare reimbursement. (C-AR at 219, 515.). The FI finalized adjustments to Scottsdale's 2005 cost report in an NPR dated April 20, 2007, denying $88,961 of the facility's total Medicare reimbursement. (C-AR at 157.). The FI cited the CMS must-bill policy as its reason for denying

---

[1]     The applicable periods at issue are the Plaintiffs' respective cost reporting periods. For Scottsdale, the cost reporting periods at issue had fiscal year end ("FYE") of December 31, 2004 and December 31, 2005. Select Specialty's are as follows: Select Specialty—Delaware, cost reporting period with a FYE of 7/31/05; Select Specialty—Jefferson Parish and Select Specialty—Fort Smith, cost reporting periods with FYEs of 8/31/05; Select Specialty—Denver, cost reporting period with a FYE of 9/30/05; and Select Specialty—Orlando, cost reporting period with a FYE of 12/31/05

ORDER-10

these amounts. The total amount in controversy for the Scottsdale facility is $135,655. (C-AR at 157.).

In July 2007, Select Specialty's fiscal intermediary, Wisconsin Physicians Service Insurance Corporation ("Wisconsin" or "FI") finalized adjustments to Select Specialty's cost reports in a NPR, denying a total of $438,693 of dual eligible bad debt reimbursement for the 2005 fiscal year. (S-AR 674.). The FI again cited the CMS must-bill policy as its reason for denying these amounts. (S-AR at 686.).

During a dialog between Select Specialty's Reimbursement Director, Wade Snyder, and its FI, the FI informed Select Specialty as follows:

> Since collection effort is still continuing against the state, the write off date would not occur until the day you receive the support from the state showing that they did not pay any amount. At that time it can be determined to be uncollectible....As far as reimbursement for these bad debts goes, once you get the support from the state, you can submit a listing of your current year bad debts....

(S-AR at 547.). This was restated in another communication from the FI to Mr. Snyder later that same day:

> Although billing of the state agency may seem futile, this is the requirement CMS has put forth, and is in line with their "must-bill" policy. This policy reflects the requirement in CMS Pub. 15-I Section 312, which states that "the provider must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g. title XIX, local welfare agency and guardian." As stated before, the only support CMS is allowing as proof of such is the RA from the state, with no exceptions.

(Id. at 553.).

Select Specialty alleges that it attempted to satisfy the must-bill policy but was unsuccessful. It claims that when it attempted to bill Arkansas', Louisiana's, Colorado's, and Delaware's Medicaid programs without a Medicaid provider number, each state refused to

process the claims.[2] (*Id.* at 640.). Mr. Snyder forwarded an email that he received from the Michigan Medicaid program, which refused to provide RAs for non-participating providers. (*Id.* at 516.). In response, the FI advised Select Specialty that:

> [i]t is the responsibility of the state Medicaid plans to process these RAs, regardless of whether they state that they "cannot." If they truly feel that they are unable to fulfill this requirement, they should contact CMS themselves to dispute it.

(*Id.* at 515.).

Select Specialty claims that in response to the rejected claims, four of the LTCHs at issue here applied for Medicaid enrollment. (*Id.* at 641.). Select Specialty Hospital—Orlando became enrolled in Medicaid effective May 1, 2004. Enrollment was denied to one of the three remaining hospitals allegedly because its state does not recognize LTCHs as Medicaid providers, and Medicaid enrollment is pending for the other two hospitals. In September 2007, Select Specialty contacted the FI to determine "whether a State's refusal to permit [an LTCH] to participate in its Medicaid program satisfies Medicare's 'must-bill policy' for dual eligible patients." (*Id.* at 312.). The FI responded that it does not. (*Id.* at 330.).

CMS has not consistently enforced the must-bill requirement against Plaintiffs. Prior to 2004, Scottsdale's FI reimbursed its facility for dual-eligible bad debts without requiring Medicaid RAs. (*See* C-AR at 118, 398.). Scottsdale claims that it was not until May 2006 that the FI notified Scottsdale such costs would be held to the must-bill requirement. (C-AR at 117.).

Likewise, for all of Select Specialty's cost reporting periods prior to fiscal year 2005, its FI reimbursed the facilities for dual-eligible bad debt without Medicaid RAs. (S-AR at 256-57.). Prior to April 2007, the FI allowed proof of the beneficiary's indigence (here, dual-eligible

---

[2]      This billing did not occur during the fiscal years in question, but rather, was done in response to the FI's rejection of the claims in 2007. (*See* S-AR at 259.). In addition, the bills were "sample" bills that were not claim-specific and may have contained fabricated Medicaid numbers. (*Id.* at 137, 139.).

ORDER-12

status) as a sufficient basis for Medicare bad debt reimbursement. (S-AR at 127-28, 237, 239.).

Indeed, the FI reimbursed some of Select Specialty's other subsidiary hospitals for dual-eligible

bad debt without Medicaid RA in fiscal year 2005. Select Specialty claims that it was not until it

received an email dated April 5, 2007 from its FI, that it was notified that such costs would be

held to the must-bill standard. In the email, the FI stated:

> "[F]rom this point forward, all providers, Medicaid certified or not, MUST bill
> the State and obtain a valid RA showing denied or partial payment before we
> allow the bad debt on the cost report."

(S-AR at 546-49.) (emphasis in original).

## IV.   PROCEDURAL HISTORY

Pursuant to 42 C.F.R. § 405.1837, Plaintiffs appealed the fiscal year 2004 and fiscal year

2005 NPRs to the PRRB. (C-AR at 37; S-AR at 457.). The issue before the PRRB was whether

the "must-bill" policy applies to Plaintiffs' dual-eligible bad debts when Plaintiffs did not

participate in Medicaid. (C-AR at 35; S-AR at 48.). Select Specialty's hearing was held on

December 3, 2008 and the PRRB issued a decision on April 13, 2010. Scottsdale's hearing was

held on June 2, 2009 and the PRRB issued a decision on April 9, 2010. Both decisions reversed

the FIs' adjustments. The Board concluded that CMS' "must-bill" policy "has no foundation in

law and is beyond the requirements of the regulations and [PRM]. Application of the must-bill

policy to dual-eligible bad debts when the Provider did not participate in the Medicaid program

is improper." (C-Dkt. No. 1, Ex. A at 10.).

The CMS Administrator reviewed the PRRB's decisions pursuant to § 1878(f)(1) of the

Act. The parties were notified of the Administrator's intention to review the Board's decisions,

and CMS and the FIs submitted comments requesting that the decisions be reversed, while the

Plaintiffs submitted comments requesting that the decisions be affirmed. In decisions dated June

ORDER-13

1 and June 9, 2010 (the "Administrator's Decisions" or the "Decisions"), the Administrator reversed the PRRB's ruling. The Administrator held that the bad debts claimed by Plaintiffs were properly disallowed by the FIs because Plaintiffs had failed to determine that the "debt was actually uncollectable when claimed as worthless as required under 42 C.F.R. 413.89(e)(3) and [the PRM]." (C-AR at 12.). "[B]ecause the Provider has not billed the State and the State had not issued RAs for these services contemporaneous with the cost reporting periods, the bad debts cannot be demonstrated as" meeting the Medicare Bad Debt Criteria. (*Id.* at 15.). In sum, the Administrator reasoned that:

> [T]he remittance advices are critical as they document the proper payments that should be made from the respective programs. Moreover, a fundamental principle of the [Medicare] program is that payment be fair to the providers, the "contributors to the Medicare trust fund[,]" and to other patients. In this instance the Medicare program is reasonably balancing the accuracy of the bad debt payment and the need to ensure the fiscal integrity of the Medicare funding, with the providers['] claims for payment which can be made under two different programs for which Medicare is the payer of last resort.

(*Id.* at 16.).

Following the Administrator's Decisions, Plaintiffs timely appealed by filing a complaints with this Court on August 5 and August 12, 2010. Scottsdale moved for summary judgment on February 12, 2011 (c-dkt. no. 13), Select Specialty moved for summary judgment on March 25, 2011 (s-dkt. no. 20), and Defendant filed cross-motions for summary judgment on April 1 and June 23, 2011 (c-dkt. no. 14; s-dkt. no. 23). The motions are now ripe for review.

## V.    DISCUSSION

### A.    Standard of Review

Pursuant to the Medicare statute, this court reviews Administrator Decisions in accordance with standard of review set forth in the Administrative Procedures Act (the "APA"). 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Mem'l*

ORDER-14

*Hosp./Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 116 (D.C.Cir.1987). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),(E). The arbitrary-and-capricious standard and the substantial-evidence standard "require equivalent levels of scrutiny." *Adair County*, 829 F.2d at 117. Under both standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43 (1983). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not disturb the agency's action. *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C.Cir.1998). The burden of showing that the agency action violates the APA standards falls on the provider. *Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C.Cir.1979).

The parties contest the level of deference this court should apply in reviewing the Administrator's Decisions. Defendant argues that the appropriate level is "substantial deference" as set forth in *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). (*See, e.g.*, C-Dkt. No. 20 at 2.). Plaintiffs counter that substantial deference is not warranted in this case. Relying on *GCI Health Care Centers, Inc. v. Thompson*, 209 F.Supp.2d 63 (D.D.C. 2002), Plaintiffs argue that provisions of the PRM are subject the less-deferential *Skidmore* standard (C-Dkt. No. 18 at 3 citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).).

The court finds that because what is at issue here is the Secretary's interpretation, through the PRM, of her own regulation—42 C.F.R. § 413.89(e)—the appropriate standard is "substantial deference" as set for in *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (noting that the Court "must give substantial deference to an agency's interpretation of its own

ORDER-15

regulations").  This court's task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, this court must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id*. (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."  *Id*. (quoting *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 697 (1991)).

Indeed, the D.C. Circuit has stated that "[a court's] review in such cases is 'more deferential . . . than that afforded under *Chevron*.'" *Wyo. Outdoor Council v. U.S. Forest Serv*., 165 F.3d 43, 52 (D.C.Cir. 1999) (internal citation omitted); *Psychiatric Inst. of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 813-814 (D.C.Cir. 1981) (noting that "where the decision under review involves an agency's interpretation of its own regulations, forming part of a complex statutory scheme which the agency is charged with administering, the arguments for deference to administrative expertise are at their strongest"). Moreover, this Court has made clear that "[t]he high degree of deference due to the Secretary's interpretation of Medicare regulations extends to the PRM provisions, which are themselves interpretation of regulations." *Cmty. Care Found. v. Thompson*, 412 F. Supp. 2d 18, 22-23 (D.D.C. 2006) (internal citation omitted) (citing *Shalala v. St. Paul-Ramsey Medical Ctr*., 50 F.3d 522, 528 (8th Cir.1995). Thus, the PRM instructions are entitled to a high level of deference.

ORDER-16

**B.     Analysis**

The issue before this court is whether the Administrator's decision that CMS' must-bill policy applies to a provider's dual-eligible bad debts when the provider does not participate in the Medicaid program is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case."

### 1.     The Must-Bill Policy Is an Appropriate Exercise of the Secretary's Authority to Interpret Her Own Regulations

The Medicare statute gives the Secretary broad discretion to determine what "reasonable cost[s]" of services to Medicare beneficiaries may be reimbursed to "providers of services." *CHMP*, 323 F.3d at 789; 42 U.S.C. § 1395x(v)(1)(A) (stating that reasonable costs "shall be determined in accordance  with regulations establishing the method or methods to be used, and the items to be included"). It also grants the Secretary broad discretion as to what information to require as a condition of payment to providers under the Medicare program. 42 U.S.C. § 1395g(a). Since "Congress has explicitly left [this] gap for the agency to fill," any regulation regarding the issue must be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *CHMP*, 323 F.3d at 790 (quoting *Chevron*, 467 U.S. at 843-44).

Utilizing this statutory authority, the Secretary has promulgated regulations setting forth what constitutes "bad debt." CMS defines bad debt as the "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services." 42 C.F.R. § 413.89(d). This includes any unpaid Medicare deductibles and coinsurance. *Id*. CMS has established four criteria that must be satisfied in order for the bad debt to be "allowable"—in other words, eligible for reimbursement:

(1) The debt must be related to covered services and derived from deductible and

ORDER-17

coinsurance amounts.
(2) The provider must be able to establish that reasonable collection efforts were made.
(3) The debt was actually uncollectible when claimed as worthless.
(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

*Id*. at § 413.89(e). CMS provides further interpretive guidance through PRM §§ 310, 312 and 322. Section 310 defines a "reasonable collection effort" as an effort similar to what a provider would make to collect amounts owned by non-Medicare patients and "*must* involve the issuance of a bill…." (*See* C-Dkt. No. 14, Ex. 1 at 3-5 (emphasis added).). It also states that the "provider's collection effort should be documented" with "copies of the bill(s)…." (*Id*. at 3-6.). Section 312 excuses providers from billing indigent patients, but this section does not speak to the financial obligations of the state Medicaid program under these circumstances. (*Id*. at 3-6.). Section 322 addresses this. Section 322 provides that any portion of Medicare co-payments and deductibles owed and not paid for by dual-eligibles, and for which the state is not responsible, may be claimed as Medicare bad debt. (*Id*. at 3-8 to 3-8.1.). However, where "a State is obligated by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, these amounts are not allowable as bed debts under Medicare." (*Id*.). In other words, where a state may be liable for coinsurance and deductible debt not paid by the patient, bad debt can be reimbursed only and to the extent that the state does not pay.

These propositions, in the Secretary's view, necessarily imply that a potentially liable state must be billed. *See CMHP*, 323 F.3d at 794. Otherwise, the Secretary contends, the requirement under PRM § 322 that the state not have satisfied the patient's debt would be illusory if the regulations did not impose a duty to demand payment from the state. *Id*. at 794-95. This court agrees that PRM §§ 310, 312, and 322 are reasonably read to require that the state be

ORDER-18

billed. At most, these provisions are ambiguous, and this court must defer to the Secretary's reasonable determination that billing is required. *Id*. at 796.

The court also finds that the must-bill policy is consistent with the Medicare statute and regulations, and is not an unreasonable implementation of either. The Secretary asserts that the policy is necessary to ascertain whether "reasonable collection efforts [have been] made" and that "the debt was actually uncollectible when claimed [as worthless]," as required by Section 413.89(e). *CMHP*, 323 F.3d at 792 (quoting *California Hosp*., 2000 WL 33170706, *8.). The Secretary claims that billing the state is the most straightforward and reliable way of determining whether, and, if so, how much the state will pay. A patient's financial situation and Medicaid eligibility status may change over the course of a very short period of time. As such, the Secretary argues, because the State maintains the most accurate patient information regarding a patient's Medicaid eligibility status at the time of service, it is in the best position to determine the State's cost sharing liability for unpaid Medicare deductibles and coinsurance. (C-Dkt. No. 1, Ex B at 9.). Given this assertion, this court is unable to say that the must-bill policy is inconsistent with the statute or regulations or is an unreasonable implementation of them. *See CMHP*, 323 F.3d at 793 (noting that even though the "regulations can be read as not precluding the possibility of a provider's establishing the criteria of § 413.80(e) by alternative means…[t]his would not, however, justify [the court] refusing to accept the Secretary's [must-bill policy]."). It is well established that courts "may not set aside the agency's interpretation merely because another interpretation was possible and seems better, so long as the agency's interpretation is

ORDER-19

within the range of reasonable meanings that the words of the regulation admit." *Psychiatric Institute of D.C. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981).[3]

### 2. The Must-Bill Policy Is Not New

Plaintiffs argue that the Administrator's Decision is arbitrary and capricious because it is based on a policy that cannot be found in the Medicare Act, the Medicare regulation governing reimbursement for bad debt, or CMS' interpretive guidance on this issue. The court disagrees. As discussed above, the must-bill policy is set forth in PRM §§ 310, 312 and 322 and further clarified in JSM 370. *See California Hospitals Crossover Bad Debts Group Appeal* PRRB Dec. No. 2000-D80 (2000 WL 33170706,*8). The must-bill policy has been consistently articulated in the final decisions of the Secretary addressing this issue. *See, e.g., Hoag Mem. Hosp. Presbyterian Provider v. Blue Cross,* 2002 WL 31548714 (2002); *Hospital de Area de Carolina*, Admin. Dec. No. 93-D23; *Concourse Nursing Home*, PRRB Dec. No. 83-D152; *St. Joseph Hospital*, PRRB Dec. No. 84-D109. Similarly, this court has already affirmed the must-bill policy. *GCI Health Care Ctrs v. Thompson*, 209 F.Supp.2d 63, 74 (D.D.C. 2002) (holding that there is nothing arbitrary or capricious about the requirement); *see also, CHMP*, 323 F.3d 782, 793 (9th Cir. 2003) (holding that the must-bill policy is a reasonable implementation of the reimbursement system and consistent with the governing statute and regulations).

---

[3]     The court is also persuaded by the Administrator's argument that "a fundamental principle of the [Medicare] program is that payment be fair to the providers, the 'contributors to the Medicare trust fund' and to the other patients." (C-Dkt. No. 1, Ex. 2 at 16.). Therefore, the Secretary argues, the must-bill policy is a logical extension of the Medicare program's attempt to "reasonably balance[] the accuracy of the bad debt payment and the need to ensure the fiscal integrity of the Medicare funding" against a provider's claims for reimbursement "which can be made under two different program[s] for which Medicare is the payer of last resort." (*Id.*).

ORDER-20

### 3.   The Must-Bill Requirement Did Not Require Notice-and-Comment Rulemaking

Under the APA, an agency's informal rulemaking must: (1) provide adequate advance notice and publication of the proposed rule in the Federal Register, (2) afford interested persons and opportunity to comment, (3) publish the final rule with a statement of basis and purpose not less than 30 days before its effective date, and (4) grant interested persons the right to petition for the issuance, modification or repeal of a rule. 5 U.S.C. § 533. Unless a specific exception applies, these procedures apply to all informal rules, which are defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551.

Plaintiffs allege that "with no prior notification or opportunity for comment, CMS adopted a new and unprecedented interpretation of the must-bill policy and applied it retroactively to deny Plaintiff[s'] Medicare reimbursement for otherwise allowable bad debts." (C-Dkt. No. 13 at 32.). Plaintiffs argue that in so doing, CMS failed to comply with the notice-and-comment requires of the APA.

The notice-and- comment requirements of the APA only apply to so-called "legislative" or "substantive" rules; they do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b); *see, e.g., Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (citing *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988)); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 945-946 (D.C. Cir. 1987) (per curium). When an agency issues an interpretative rule, it is only intending to explain ambiguous language, or remind parties of existing duties—not create new law. *See Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979). Interpretative rules may affect the way parties act or "alter the manner in which parties present themselves or their

ORDER-21

viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C.Cir.1980); *Cabais v. Egger*, 690 F.2d 234, 238 (D.C. Cir.1982). Such effects are entirely permissible under the interpretative rule exception, so long as the rule represents the agency's explanation of a statutory or regulatory provision, and the rule is not intended to substantively change existing rights and duties. *Fertilizer Institute v. E.P.A.*, 935 F.2d 1303, 1308 (D.C. Cir.1991).

The D.C. Circuit has held that, generally speaking, an agency's rule is a "legislative rule," and thus subject to the APA's notice-and-comment requirements, if a court can answer affirmatively any of these questions: (1) whether in the absence of the rule there would not be adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties; (2) whether the agency has published the rule in the Code of Federal Regulations; (3) whether the agency has explicitly invoked its general legislative power; and (4) whether the rule effectively amends a prior legislative rule. *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). None of these conditions has been met. Instead, the Secretary's policy is a classic example of an interpretive rule or general statement of policy, not subject to the APA's notice and comment rulemaking requirement. *See Guernsey Mem'l Hosp.*, 514 U.S. at 96 (Secretary need not promulgate a regulation to "address every conceivable question in the process of determining equitable reimbursement"). In fact, Plaintiffs, themselves, repeatedly characterize the policy as "interpretive."

Plaintiffs cite *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997), for the proposition that an agency can only change its interpretation of a regulation through notice-and-comment rulemaking. (C-Dkt. No. 18 at 22.). The court in *Paralyzed Veterans*, quoting a Supreme Court decision, opined that

> [t]o allow an agency to make a fundamental change in its interpretation of a
> substantive regulation without notice and comment obviously would undermine

ORDER-22

. . . APA requirements. That is surely why the Supreme Court has noted (in dicta) that APA rulemaking is required where an interpretation 'adopt[s] a new position inconsistent with ... existing regulations.'

*Paralyzed Veterans of Am.*, 117 F.3d at 586 (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 100 (1995)). However, the D.C. Circuit court has held that the new interpretation must "significantly revise" the prior interpretation in order to trigger the notice-and-comment process. *MetWest Inc. v. Sec'y of Labor*, 560 F.3d 506, 510 (D.C.Cir. 2009); *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C.Cir.1999) ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, which requires notice and comment.") This condition is not met if the new interpretation can reasonably be interpreted as consistent with the prior one. *Air Transport Ass'n of Am. v. FAA*, 169 F.3d 1, 6 (D.C. Cir. 1999). Here, the Secretary's interpretation of the must-bill policy does not significantly revise her prior interpretation and nothing in her decision is inconsistent with existing regulations.

Plaintiffs' related assertion that the must-bill policy arose only after the decision in *CHMP* is misguided. In *CHMP*, the court upheld application of the must-bill policy to the plaintiff providers' cost years 1989 -1995, well before the 2004 year at issue here. *See CHMP*, 323 F.3d at 785. As previously stated, the must-bill policy upheld in *CHMP* and *GCI* derives from longstanding Medicare regulations and manual provisions. 42 C.F.R. § 413.80; PRM §§ 310, 312, 322. The only thing that occurred as a reaction to the *CHMP* decision was the Secretary's revision of a separate manual provision—PMR-II § 1102.3L—that the Ninth Circuit identified as potentially in conflict with the must-bill policy. Notably, though, the Ninth Circuit concluded that *it* conflicted with the must-bill policy and was not enforceable. *See CHMP*, 323

F.3d at 798. Although the Secretary thus subsequently revised that provision, the must-bill policy was in effect the whole time, from before the 1989 year at issue in *CHMP* to the present day.

### 4.    The Secretary's Enforcement of the Must-Bill Policy against Plaintiffs

The question remains whether it is arbitrary and capricious for the Secretary to apply the must-bill policy to a provider's dual-eligible bad debts when the provider does not participate in a state's Medicaid program. Non-participating providers are caught in a classic Catch-22. They provide services to dual-eligible patients (at least some of whom become Medicaid eligible *after* they were admitted to the facilities) and then attempt to collect payment for the bad debt incurred as a result of those services. The FI refuses to reimburse the facilities without a state-issued RA, and the states refuse to issue the RAs. Complicating the issue further is the fact that Plaintiffs indicate that some states are unwilling to certify their facilities. It seems that Plaintiffs are left in the untenable position of either refusing to treat dual-eligible patients or absorbing the bad debt associated with those patients.

Counsel for the agency stated at oral argument that it is the Secretary's position that the states are required to issue RAs (regardless of a provider's participation status) and to enroll Plaintiffs' facilities in their Medicaid programs. Failure to do so violates the governing statutes and regulations. However, agency's counsel conceded that it is in a better position than the providers to ensure that the states comply with the applicable regulations of the Medicaid program. On the other hand, Plaintiffs' counsel conceded at oral argument that, to date, the providers have not submitted proper bills for services provided to actual patients. Rather, the providers submitted "sample" bills with fabricated claim numbers.

In light of these circumstances, Plaintiffs are not entitled to summary judgment at this time. They have not made the correct applications to receive reimbursement. Nevertheless, the

ORDER-24

court is not willing to place a stamp of judicial approval on a policy that puts non-participating providers in the position of not being paid due to the delinquency of federally-funded state programs. If, at some point, Plaintiffs can establish that they have submitted the correct forms and made the right applications, it may in fact, in those circumstances, be arbitrary and capricious for the Secretary to not accept an alternative form of documentation or to require that the states comply with her regulations.

### 5.    The Secretary's Prior Inconsistent Treatment of Plaintiffs' Bad Debt Claims

Plaintiffs argue that the Administrator's Decisions are arbitrary and capricious because they constitute an unexplained departure from CMS' prior treatment of their dual-eligible bad debts. The Secretary's application of the must-bill policy to Plaintiffs is inconsistent with the Secretary's prior treatment of Plaintiffs' reimbursement requests. For all of the Plaintiffs' cost reporting prior to fiscal year 2004-2005, and in fact, for some of Plaintiffs' subsidiary facilities' the cost reporting periods applicable in fiscal year 2005, the FIs reimbursed Plaintiffs for dual-eligible bad debts without Medicaid RAs. Indeed, Select Specialty's FI, in an email dated April 5, 2007, confirmed the Secretary's practice of not requiring Medicaid RAs in order to reimburse Medicare bad debt: "If a provider is not Medicaid certified, they shouldn't be required to bill the state before we allow the bad debt as the state does not have any liability to non-Medicaid-certified providers." (S-AR 549.). Plaintiffs also note that before PRM-II § 1102.3L  was rescinded by the Secretary after the *CHMP* decision in 2003, it provided: "it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment." Therefore, Plaintiffs argue, the Administrator's Decisions are arbitrary and capricious because they did not take into account Plaintiffs' legitimate reliance interests.

ORDER-25

As the United States Supreme Court has stated: "Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation may be 'arbitrary, capricious or an abuse of discretion.'" *Smiley v. Citibank*, 517 U.S. 735, 742 (1996); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) (an administrative determination is arbitrary and capricious if it "depart[s] from a prior policy sub silentio" or if the "prior policy has engendered serious reliance interests" that were not taken into account). The mere fact that an agency interpretation contradicts a prior agency position is not fatal. *Smiley*, 517 U.S. at 742 (stating that "change is not [necessarily] invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency"). But if the change does not take into account a legitimate reliance on prior interpretation, *see, e.g., United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 670-675 (1973), it may be "arbitrary, capricious [or] an abuse of discretion." *Smiley*, 517 U.S. at 742.

Here, the Secretary did not change her policy—the must-bill requirement is longstanding—but CMS did change how it enforces the policy. As the Ninth Circuit noted at the time of the *CHMP* decision, CMS guidance PRM-II § 1102.31 allowed providers to show other documentation in lieu of billing the states. *CHMP*, 323 F.3d at 798. The Ninth Circuit noted that this conflicted with the must-bill policy and, therefore, was unenforceable. *Id*. Accordingly, on August 10, 2004, the Secretary revised that provision, reiterating that the must-bill policy applies to dual-eligible beneficiaries.[4]

---

[4]      Plaintiffs also note that prior published instructions for completing form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) stated that, "it may not be necessary for a provider to actually bill Medicaid to establish [dual-eligible] bad debt where the provider can establish that Medicaid is not responsible for payment. In lieu of billing Medicaid, the provider must furnish documentation of [Medicaid eligibility and non-payment that would have resulted from billing Medicaid]." (S-AR at 511-513.). CMS deleted this language from HCFA-339, effective on October 1, 2003, well before the fiscal years at issue here. (*See* S-Dkt. No. 20 at 8.).

ORDER-26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The court finds it significant that the must-bill policy had not been applied to Plaintiffs' dual-eligible bad debt claims before the FIs' current disallowance at issue here. (*See, e.g.*, S-Dkt. No. 20 at 8 (citing an email from Select Specialty's FI: "CMS…has historically taken the position that the [must-bill] policy does not apply, and the billing is not required, where Medicaid, as a matter of law, cannot be responsible for the claim." (S-AR at 549).). JSM 370 may have placed providers on notice that CMS would no longer accept documentation in lieu of a state's RA, but it was not issued until August 10, 2004. The Secretary now seeks to retroactively apply JSM 370 to Plaintiffs' cost reporting for fiscal years 2004-2005. The Secretary provides no explanation for her sudden change in enforcement, other than to state that prior inconsistent reimbursements are "unfortunate." Nor does she explain why some of Plaintiffs' subsidiaries receive reimbursement for 2005 dual-eligible bad debt claims that were not substantiated with state RAs. Furthermore, Plaintiffs argue that JSM 370 was issued to fiscal intermediaries, not to providers like Plaintiffs. They contend that the first time they became aware of the Secretary's new enforcement policy was in 2007, when their respective FIs rejected the cost reports for fiscal years 2004 and 2005.

Based on these allegations, the court finds that CMS' enforcement of the must-bill policy to Plaintiffs' claims may "constitute a change that does not take [into] account [] legitimate reliance on prior interpretation" and therefore may be arbitrary, capricious or an abuse of discretion." *Smiley v. Citibank*, 517 U.S. 735, 742 (1996). Therefore, the court will remand to the agency for reconsideration of the limited issue of whether Plaintiffs were justified in relying on CMS' prior failure to enforce the must-bill policy with respect to dual-eligible reimbursement claims from non-participating Medicaid providers. *See NTEU v. Fed. Labor Relations Auth.*, 30 F.3d 1510, 1514 (D.C. Cir. 1994).

ORDER-27

**IV**.    **CONCLUSION**

Based on the foregoing, the court HEREBY rules as follows:

Defendant's and Plaintiffs' motions for summary judgment are GRANTED in part and DENIED in part. Plaintiffs' cases are REMANDED to the agency for reconsideration on the limited issue of whether, in 2004 and 2005, Plaintiffs' were justified in relying on the Secretary's prior failure to enforce the must-bill policy against them.

DATED this 26th day of March, 2012.


Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER-28